**UNITED STATES of America ex rel. Frank DeFORTE, Appellant,**

v.

**Vincent R. MANCUSI, Warden of Attica Prison, Attica, New York, Appellee.**

**No. 478, Docket 31112.**

United States Court of Appeals Second Circuit.

Argued June 1, 1967.

Decided June 28, 1967.

James L. Lekin, Buffalo (Michael E. Mecsas, Saperston, Wiltse, Duke, Day & Wilson, Buffalo, N. Y., on the brief), for appellant.

Henry P. Devine, Asst. Dist. Atty. (William Cahn, Dist. Atty., Nassau County, on the brief), for appellee.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The sole issue presented by this appeal is whether the appellant, Frank DeForte, a vice-president of Local 266 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, had "standing" to object to the use against him in a criminal prosecution of various union books and records that admittedly were illegally seized from the union's office by state officials, over the appellant's protests.

## I.

The parties have stipulated to the essential facts which are relatively simple. DeForte, Joseph DeGrandis, and Ernest Zundel, all officers of Local 266, were indicted in Nassau County for conspiracy (N.Y.Penal Law, McKinney's Consol. Laws, c. 40, § 580), coercion (N.Y.Penal Law, § 530) and extortion (Penal Law, §§ 850, 851) in connection with an alleged monopolization of the juke box industry in the New York City metropolitan area. They were charged with organizing the owners of music machines and juke boxes, and exacting tribute from them in the form of what appeared to be legitimate initiation fees, dues and monthly assessments. Prior to trial, the District Attorney's Office of Nassau County issued a subpoena *duces tecum* commanding the local to produce certain books and records. When the union refused to surrender these materials, the state officials who

served the subpoena seized the books and records over the protests of DeForte, who was present at the time in the union's office.[1] The search and seizure were conducted despite the absence of a search warrant, and the state has never attempted to justify the behavior of its officials. Indeed, it has admitted the illegality of their acts.

The illegal search produced significant and substantial evidence. The books and records seized consisted, in the main, of the union charter, minutes of Local 266 meetings, the local's bank book, and cancelled checks and stubs. Also taken were applications to join the union by the officers and other prospective members of the local. Appellant, we are told without denial, played a considerable role in the preparation of these materials. Thus, for example, all checks seized were signed by him together with two other officers; he procured and processed the applications of various members; and he made a substantial number of entries in the local's check book, ledger and records. Moreover, it is conceded that appellant was in possession and/or control of the books and records when they were seized from the union's office. That these records were not of little importance to the state's case is revealed by its admission that "most of the books and records of Local 266 which were seized were introduced into evidence."

The trial of appellant and his co-defendants resulted in the conviction of De-Forte, DeGrandis and Zundel, and the acquittal of 12 other defendants named in the indictment. Appellant was subsequently sentenced to a term of from 3 to 5 years in prison. Following his conviction, DeForte appealed to the Appellate Division of the Supreme Court, Second Department, and thereafter to the New York Court of Appeals, alleging, among other points, that the search of the union's office and the seizure of its books and records were illegal, and accordingly the evidence should not have been admitted against him at trial. Both appellate courts affirmed the conviction on the ground that he lacked standing to raise this issue because the books and records were not his personal or private papers, but rather were the property of the union. People v. DeGrandis, 16 A.D.2d 834, 228 N.Y.S.2d 875, aff'd, 12 N.Y.2d 812, 236 N.Y.S.2d 63, 187 N.E.2d 130 (1962). Certiorari to the United States Supreme Court was subsequently denied. 375 U.S. 868, 84 S.Ct. 91, 11 L.Ed.2d 95 (1963).

Having exhausted his state remedies, appellant applied for a federal writ of habeas corpus on an alleged "coercion of the jury" claim. His application was denied, and that denial was affirmed by this Court.[2] DeForte then filed a second application in the District Court alleging first, that the books and records used against him during the trial had been seized in violation of his Fourth Amendment rights, and second, that illegal wiretap evidence also had been improperly admitted. The latter claim was withdrawn, while the former was never considered on the merits because Judge Henderson's denial was grounded on his belief that DeForte lacked standing to raise this objection. It is from this denial that he appeals.[3]

## II.

The quest for a clear solution to the perplexing query as to who may challenge an allegedly unlawful search and seizure has been confounded by thorny problems. For nearly 50 years

1. We understand that the union's office was one large room in which defendant, as well as others, had their desks.

2. In his first application, DeForte alleged that he was denied due process because the judge, after delivering a 3½ hour charge, kept the jury in deliberations for 24 consecutive hours, although the jury twice advised the court of its fatigue. DeGrandis v. Fay, 335 F.2d 173 (2d Cir.

1964). (In the state Court of Appeals Desmond, C. J., Fuld and Froessel dissented from the affirmance and voted to reverse because they were of the view that this constituted "coercion of the jury as matter of law.")

3. The District Judge, recognizing that there was recent authority contrary to his holding, granted a certificate of probable cause.

we followed the precept that while evidence secured by federal officers as the result of an illegal search and seizure could not be used in a federal prosecution, Weeks v. U. S., 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), not all defendants had standing to challenge this evidence. Then, in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), we were told that the Fourth Amendment right to privacy was guaranteed against state invasion by the Fourteenth Amendment and had to be enforced by the same exclusionary rule found in the federal courts.[4] Thus, the states were confronted with this same "standing" problem, and were compelled to apply the rules that had been developed in the federal courts in determining this question. See U. S. ex rel. Coffey v. Fay, 344 F.2d 625, 628 (2d Cir. 1965).

In the pre-*Mapp* era, the federal rule seemed to be that in order to have standing to challenge the legality of evidence allegedly obtained in violation of the Fourth Amendment, a defendant must "claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched." Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L. Ed.2d 697 (1960). See generally R. Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 Nw.U.L.Rev. 471–86 (1952). But, some relaxation of this quite stringent standard seemed to be in the making even prior to *Jones*. In McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948), the Supreme Court held that a defendant had standing to suppress evidence that had been illegally taken from a co-defendant, who had moved unsuccessfully to suppress, because "[i]f the property had been returned [to the codefend-

ant] * * * it would not have been available for use at the trial." But see Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). And in United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), the Court ruled that a defendant who had stored narcotics in a hotel room rented by his two aunts, and to which he had been given the key, had standing to object to an unlawful search and seizure in the aunts' room. The Court added that "[t]o hold that this search and seizure were lawful as to the respondent [because the search did not invade his privacy] would permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right." Id. at 52, 72 S.Ct. at 95. But it was not until Jones v. U. S., supra, that the Supreme Court attempted to articulate some standards to guide the courts in this difficult area. A careful examination of that case is therefore essential to a proper resolution of the issues now before us.

### III.

Jones was arrested by police officers who possessed a warrant to search for narcotics in an apartment belonging to Evans, his friend. Evans had given Jones the use of the apartment, and a key with which he admitted himself on the day of the arrest. Though his home was elsewhere, Jones had a shirt and suit at the apartment, and had slept there "maybe a night." 362 U.S. at 259, 80 S.Ct. 725.

Prior to trial, Jones moved to suppress the narcotics and paraphernalia seized by the officers, claiming that their warrant had been issued without a showing of probable cause. The government challenged defendant's standing to raise this issue on the ground that he failed to allege "ownership" of the seized goods, or

4. The exclusionary rule of *Mapp* applied to state court convictions that had not become "final" before that decision was rendered. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 1734, 14 L.Ed.2d 601 (1965). Finality in this context means "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for cer-

tiorari had elpased before [the] decision in Mapp v. Ohio." 381 U.S. at 622 n. 5, 85 S.Ct. at 1734. DeForte's petition for a writ of certiorari was not denied until October 1963, after *Mapp* was decided. He was entitled, therefore, to the benefits of the exclusionary rule if he had standing to challenge the legality of the search and seizure.

an interest in the searched premises greater than that of an "invitee or guest." The District Court and the Court of Appeals adopted this argument which permitted the receipt in evidence of the seized material.

The issue squarely presented to the Supreme Court was whether Jones was a "person aggrieved" within the meaning of Rule 41(e) of the Federal Rules of Criminal Procedure,[5] and accordingly had standing to make a motion to suppress pursuant to that rule. Speaking for a unanimous Court,[6] Justice Frankfurter observed that:

> In order to qualify as a "person aggrieved by an unlawful search and seizure" *one must have been a victim of a search or seizure, one against whom the search was directed,* as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. Rule 41(e) applies the general principle that a party will not be heard to claim a constitutional protection unless he "belongs to the class for whose sake the constitutional protection is given". People of State of New York Hatch v. Reardon, 204 U.S. 152, 160, 27 S.Ct. 188, 190, 51 L.Ed. 415. * * *

> Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, *that he himself was the victim of an invasion of privacy.* 362 U.S. at 261, 80 S.Ct. 725. (Emphasis added.)

But, Justice Frankfurter went on to note that prosecution for certain crimes of possession posed a dilemma. He reasoned that if, in order to establish standing to suppress illegally seized evidence, a defendant were required to allege ownership of the seized contraband or an interest in the premises where it was found, these very allegations might later be used at the trial to establish his guilt. Moreover, if a defendant alleged possession for purposes of establishing standing, and later denied this at trial, he would be faced with a perjury charge.

In order to eschew this quandary, the Court found that "[t]wo separate lines of thought effectively sustain defendant's standing in this case." 362 U.S. at 263, 80 S.Ct. at 732. (Emphasis added.) First, when possession is sufficient to convict a defendant of the crime charged, he need not show an interest in the premises searched or in the property seized in order to have standing to move for suppression. And second, "[e]ven were this not a prosecution turning on illicit possession, the legally requisite interest in the premises was here satisfied, for it need not be as extensive a property interest as was required by the courts below." Ibid.

---

5. Rule 41(e) provides in part:
   A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. * * *

As this Court has previously noted, in an opinion by Judge Waterman, "[b]ecause the rule is * * * rooted in basic constitutional principle, the same test presumably governs standing to suppress evidence in a state prosecution." United States ex rel. Coffey v. Fay, 344 F.2d at 628.

6. Mr. Justice Douglas, though concurring in the Court's resolution of the issue of standing, dissented from the majority's finding that there was probable cause for the issuance of the warrant. 362 U.S. at 273, 80 S.Ct. 725.

In connection with the second ground, the Court rejected the technical distinctions which lower courts had borrowed from the law of property and had applied to the issue of standing.[7] Such distinctions were inconsistent with the protections guaranteed to those charged with crimes. Moreover, "[n]o just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that *anyone legitimately on the premises when a search occurs* may challenge its legality by way of a motion to suppress, when *its* fruits are proposed to be used against him." 362 U.S. at 267, 80 S.Ct. at 734. (Emphasis added.)

Thus, *Jones* dramatically liberalized the standing requirement for challenging the legality of searches and seizures. But while the case informs us as to what is *not* required to confer standing, the Supreme Court has avoided formulating, and perhaps deliberately, any specific rules for determining what *is* required. The Court apparently recognized that sweeping legal pronouncements which are meaningful are difficult to articulate because the individual's right to privacy in the particular case often conflicts with and must be balanced against society's need for efficient and vigorous police pro-tection. It appears that a proper balance can be struck only on a "case-by-case basis." See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (June 5, 1967).

## IV.

With this background of the law's evolution on "standing", it is appropriate for us to re-examine the facts in this case. While the state insists that the search and seizure were conducted against Local 266, we would be blind to reality if we did not recognize that the action by the state officials was actually "directed" at DeForte. The allegedly improper activities which the state was attempting to curtail could be halted only by prosecuting DeForte and his fellow union officials. Little would have been gained by prosecuting or fining the union alone, or even driving it to extinction, for the guiding culprits would have remained free to conduct their illegal activities through a different proscenium. (Indeed, the union was not even indicted.) That the state recognized this actuality is clearly evidenced by its placing of "monitors" on the local's telephone in order to overhear conversations of the appellant and other individuals operating behind the union facade. In these circumstances we would be myopic not to recognize that appellant was "a

7. "While this Court has never passed upon the interest in the searched premises necessary to maintain a motion to suppress, the Government's argument closely follows the prevailing view in the lower courts. They have denied standing to "guests" and "invitees" [citing cases] and employees, who though in "control" or "occupancy" lacked "possession" [citing cases]. The necessary quantum of interest has been distinguished as being, variously, "ownership in or right to possession of the premises" [citing case], the interest of a "lessee or licensee" [citing case], or of one with "dominion" [citing cases]. We do not lightly depart from this course of decisions by the lower courts. We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from un-reasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. Even in the area from which they derive, due consideration has led to the discarding of these distinctions in the homeland of the common law. See Occupiers' Liability Act, 1957, 5 and 6 Eliz. 2, c. 31, carrying out Law Reform Committee, Third Report, Cmd. 9305. Distinctions such as those between "lessee," "licensee," "invitee" and "guest," often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards." 362 U.S. at 265–266, 80 S.Ct. 725.

victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search and seizure directed at someone else." Jones v. United States, 362 U.S. at 261, 80 S.Ct. at 731.[8] Compare United States v. Birrell, 242 F.Supp. 191 (S.D.N.Y.1965), motion for reargument granted and decision affirmed, 243 F.Supp. 36 (S.D.N.Y.1965), with United States v. Re, 372 F.2d 641 (2d Cir.), cert. denied, 388 U.S. 912, 87 S.Ct. 2112, 18 L.Ed.2d 1352 (1967).

But, in the circumstances present here, the admittedly illegal search was not only "directed" at appellant, it also invaded his right of privacy—the basic right the Fourth Amendment is designed to protect. See Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (U.S. June 5, 1967); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (May 29, 1967). While much has been written on the Fourth Amendment's guaranty of the individual's right to be secure in his "home," it is now well established that the freedom from unreasonable searches and seizures extends to one's place of business as well. See Berger v. State of N. Y., 388 U.S. 41, 87 S.Ct. 1873, 18 L. Ed.2d 1040 (June 12, 1967); Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L. Ed. 319 (1920). "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943.

It is undisputed that DeForte was actually present in the union's office at the time of the illegal search and seizure. This office also served as his place of business and in which he spent a considerable part of each day. It appears to us to have been a clear invasion of privacy for the state's officials to have descended upon what was the union's office *de jure*, but DeForte's office *de facto*, and without a warrant and over his vigorous protests to have seized books and records, a substantial portion of which he had prepared and which were in his custody. We do not believe that in these circumstances any just interest of the Government in the effective and rigorous enforcement of the criminal law is hampered by recognizing that one situated as DeForte may challenge the legality of a search. See Jones v. United States, 362 U.S. at 267, 80 S.Ct. 725. Accordingly, he had standing to move for the suppression of the fruit of the illegal search, and the use of these books and records against him at his trial requires that his conviction be set aside.[9]

## V.

We note that the cases cited by the state as enunciating a different principle

---

8. In United States ex rel. Coffey v. Fay, supra, we held that where stolen jewels had been seized from Coffey's companion, Kingdom "Bill" DeNormand, at the time he and appellant were arrested in the latter's car, the search was "directed against" Coffey. 344 F.2d at 628–629. In that case, however, the appellant was confronted with the dilemma discussed in *Jones*, since he was being prosecuted for possession of stolen property.

9. The state argues, and appellant readily concedes, that the union could have been compelled to submit its books and records pursuant to a subpoena, and that if these materials had been legally obtained, DeForte's Fifth Amendment right against self-incrimination would not have prevented this evidence from being used against him. See United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). But, just as a search cannot be justified by the potent evidence it produces, see, e. g., United States ex rel. Rogers v. Warden, 381 F.2d 209 (2d Cir., June 15, 1967), so too an unlawful search cannot be justified on the ground that the evidence seized might have been obtained by other and lawful means.

are inapposite or clearly distinguishable. In United States v. Bozza, 365 F.2d 206 (2d Cir. 1966), for example, the appellants had abandoned possession of a stolen gun to Guzzo, one of the members of the burglary ring. None of the appellants claimed any legitimate interest in the weapon; nor had any of them been present in Guzzo's home when the allegedly illegal search occurred. In those circumstances we denied standing stating that "[t]he values that the Fourth Amendment protects are sufficiently advanced by excluding the results of illegal searches and seizures at the behest of 'victims' *in the broad sense the Supreme Court has given that term* * * *."* Id. at 223. (Emphasis added.)

Similarly, in United States v. Granello, 365 F.2d 990 (2d Cir. 1966), the papers which appellants were attempting to suppress had not been seized from them; nor had they contributed in any way to their preparation. And in United States v. Fago, 319 F.2d 791 (2d Cir.), cert. denied, 375 U.S. 906, 84 S.Ct. 197, 11 L.Ed.2d 146 (1963), the corporate records in question had been *lawfully* obtained by the District Attorney of Erie County "for a purpose wholly unrelated to the subsequently initiated federal inquiry," id. at 792, and then were turned over to officials of the Internal Revenue Service.

The other cases relied upon by the state (United States v. Guterma, 2 Cir., 272 F.2d 344 (1959); United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, cert. denied, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946); United States v. DeVasto, 2 Cir., 52 F.2d 26, cert. denied, 284 U.S. 678, 52 S.Ct. 138, 76 L.Ed. 573 (1931)), were decided prior to *Jones*, and are, therefore, precedents of dubious value. More in point, we believe, is Henzel v. United States, 296 F.2d 650 (5th Cir. 1961), which is in accord with our holding here.[10]

## VI.

■ Finally, we observe that our decision is consonant with the rationale of the exclusionary rule which is "to deter— to compel respect for the constitutional guaranty [against unreasonable searches and seizures] in the only effective way— by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). The underlying assumption of the rule is that the incentive for conducting illegal searches and seizures will be largely destroyed if prosecutors are barred from using the fruit in a criminal prosecution. And it is argued that if the incentive is reduced, the police will have less reason to violate the individual's right of privacy.[11]

10. Henzel was the sole shareholder and president of the Chemoil Corporation whose property was searched by a postal inspector without a warrant. The Court of Appeals concluded that it was not decisive of the suppression issue raised that "the property seized and the premises searched in this case were owned by a corporation rather than by an individual. Since a corporation has the same rights as a natural person to be free from illegal searches and seizures, Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, there is nothing in the corporate status * * * which would prevent appellant from attacking the unlawful search and seizure of the corporation's property." 296 F.2d at 652. Although Henzel was not present when the illegal search and seizure occurred, the court found that the search was "directed at" him. The fact that he had

prepared much of the material seized and spent the greater part of each day in his office gave him a sufficient interest in the property to have standing. This conclusion would appear to be *a fortiori* in our case where the appellant was actually present when the search occurred. See also Villano v. U. S., 310 F.2d 680 (10th Cir. 1962). But see United States v. Grosso, 3 Cir., 358 F.2d 154 (1966), in which the Third Circuit apparently concluded that the rationale of *Jones* should be limited to those cases in which a dilemma is posed because the defendant has been charged with a possessory crime.

11. The fact that such deterrence is achieved at a high price—the suppression of relevant evidence—has led some observers to conclude that the exclusionary rule should be selectively applied by imposing rather

We have already noted that it would be unwise to use this case as a vehicle for resolving all controversy in this broad area. But we recognize that in the interpretation of opinions, some of the most glaring errors have been made by mechanical and unreflective application of new or old formulations, and neglect of the differences between cases leads to unfortunate and unanticipated consequences. Mindful of this, we therefore caution that we have *not* concluded that every shareholder, or employee, or union member has standing to object to the unlawful seizure of his corporation's or union's books and records. And we have *not* held that every officer has standing to require the suppression of such materials. We do decide that the facts presented to us clearly reveal that the admittedly illegal search and seizure were "directed" at appellant, and that his right of privacy was invaded by the unwarranted action of the state officials. In these circumstances we can discern no legitimate reason for denying DeForte standing.[12]

The Court wishes to express its appreciation to assigned counsel, James L. Lekin of Buffalo, New York, for the time and skill which he devoted to this appeal.

Order reversed and case remanded to the District Court for issuance of the writ of habeas corpus.

strict standards for standing. See, e. g., R. Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 Nw.U.L. Rev. 471 (1952) ; Comment, Standing to Suppress Evidence Obtained by Unconstitutional Search and Seizure, 55 Mich.L.Rev. 567 (1957). At the other end of the spectrum, however, many commentators have argued that the standing requirement should be liberalized, or even abolished so that all evidence obtained as the result of an unreasonable search and seizure would be excluded in criminal prosecutions. See, Note, Standing to Object to an Unreasonable Search and Seizure, 34 U.Chi.L.Rev. 342 (1967) ; F. Allen, The Wolf Case: Search and Seizure, Federalism, and the Civil Liberties, 45 Ill.L.Rev. 1 (1950) ; R. Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L.J. 319.

Proponents of this latter view argue quite forcefully that since the exclusionary rule seeks to deter illegal conduct by the removal of incentives, its prophylactic effect is diminished whenever the prosecution is allowed to introduce the fruit of an illegal search. California, however, is the only state whose highest court has eliminated the standing requirement. See People v. Martin, 45 Cal.2d 755, 290 P. 2d 855 (1955) (Traynor, J.). This Court has refused to take such a step. See United States v. Bozza, 365 F.2d at 223.

12. In light of our conclusion, we find it unnecessary to consider appellant's alternate argument that the decision of the Supreme Court in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) also requires us to reverse.