UNITED STATES of America, Appellee,

v.

John Frank GALANTE and Theodore N. Cameriero, Appellants.

Nos. 308, 350, Dockets 76–1165, 76–1308.

United States Court of Appeals, Second Circuit.

Argued Oct. 7, 1976.

Decided Dec. 14, 1976.

Edward R. Korman, Chief Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (David G. Trager, U. S. Atty., Lee A. Adlerstein, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellee.

H. Elliot Wales, New York City, for appellant Galante.

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for appellant Cameriero.

Before KAUFMAN, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

After a jury trial before the late Judge Judd, appellants were convicted of possessing and conspiring to possess a quantity of Nikkor camera lenses stolen from interstate commerce, in violation of 18 U.S.C. §§ 659, 371. Appellant Cameriero, whose true name is Frank Ranzie, was sentenced to concurrent prison terms of four years. Appellant Galante received a five-year sentence on the conspiracy count, and a sentence of two-years probation following his release from custody on the possession count. The only issue raised by Cameriero, and the only issue of substance raised by Galante, relates to the search for the lenses and their seizure. We affirm.

The facts of this case are not complicated. On March 22, 1975, 15 cartons of Nikkor lenses, along with a large quantity of radios and electronic calculators, were stolen from the Greenpoint Terminal Warehouse in Brooklyn. The goods were concealed in the basement of a store, the "Bristol Bargain Fair," owned by Manachem Cohen, a co-conspirator who pled guilty and testified for the government. Cohen testified that Galante and an unknown person arranged for the storage of the stolen items after the theft.

On April 4, 1975, Cohen was arrested while attempting to sell some of the stolen items. Five days later, FBI agents searched the Bristol Bargain Fair under a warrant. There they found the rest of the stolen goods, but did not remove them. The store was kept under surveillance. By this time Cohen had begun cooperating with the government. On April 11, Galante called Cohen, who insisted the goods be removed, and informed him that someone was coming to pick up the stolen items. Cameriero arrived in a truck, which he proceeded to load with the assistance of Cohen. Cameriero was then arrested by the agents who had kept the store under surveillance.

Both defendants moved to suppress the lenses ultimately seized from the truck on the ground that the warrant authorizing the initial search of the Bristol Bargain

Fair was insufficient.[1] Judge Judd ruled that the warrant was proper, and furthermore that Cohen consented to the search of his store.

■ On appeal, the government abandoned both of those favorable rulings.[2] Instead, it urged that defendants Galante and Cameriero lacked standing to object to the search of Cohen's store.[3] As to the conspiracy count, we hold that the appellants do indeed lack standing. On the possessory count, we hold that appellants do have standing but that the seizure of the lenses from the truck was proper.

1. The grounds alleged for insufficiency were that the affidavit, which described a tip from an informant, did not set out probable cause to believe a crime had been committed. In full, the affidavit stated:

CHARLES K. BOLING, being duly sworn, deposes and says that he is a Special Agent of the Federal Bureau of Investigation, duly appointed according to law and acting as such.

Your deponent has reason to believe that there is presently being concealed in the above-described premises a quantity of cartons bearing the name Nikkor Camera Lens which cartons have been stolen from foreign commerce in violation of Title 18, United States Code, Section 659.

The facts tending to establish the grounds for the issuance for a search warrant for the above-described premises are as follows:

(1) A communication to the Federal Bureau of Investigation from a Mr. Dennis Mooney, an employee of the Greenpoint Terminal Warehouse, Inc., 49 Noble Street, Brooklyn, New York, that on March 22, 1975 the warehouse had been entered and a quantity of cartons containing Nikkor Camera Lens had been stolen. Mr. Mooney further advised that the camera lens above-mentioned had been shipped by Nippon Kogaku, Inc., of Japan to Ehren Riech Photo, Inc., of 623 Stewart Avenue, Garden City, New York, and being held at the Greenpoint Terminal Warehouse under United States Customs Bond Numbers: B 255 776, B 257 313, B 231 030.

(2) A reliable confidential informant, who has previously supplied information to the Federal Bureau of Investigation which information has resulted in the arrest of six individuals in both the Eastern and Southern District of New York for the theft of approximately Two Hundred and Fifty Thousand Dollars ($250,000) worth of stolen merchandise, which arrests have resulted in two convictions, has stated that he was in the above-described premises known as Bristol Bargain Fair Inc., on April 7, 1975. While in the above-described premises the reliable informant observed the Nikkor Camera Lens as well as Precor Radios and APF Scientific Calculators that were stolen from the Greenpoint Terminal Warehouse on March 22, 1975.

Judge Judd held that a common sense reading of the affidavit established the "reliability" required by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Subsequent to the district court finding, however, this Court rendered its decision in *United States v. Karathanos,* 531 F.2d 26 (2d Cir. 1976). In *Karathanos,* we held that *Aguilar* and *Spinelli* require that an affidavit based upon an informant's tip must set forth the basis upon which the informant believes the activity to be criminal. Although this affidavit shows an obvious attempt to comply with the "reliability" requirement, it does not meet the *Karathanos* test. Thus, if *Karathanos* is to be retroactively applied, this search was conducted under an invalid warrant, a point conceded by the government.

## I. Automatic Standing.

The law of standing under the Fourth Amendment has followed a tortuous path. The convolutions of the law stem from the fact that the proof that establishes the interest in the searched premises or the seized property necessary for standing is often highly probative of guilt. Thus, the criminal defendant may be put to the unpleasant task of electing his remedies. While some courts were willing to force defendants to make this Hobson's choice, *Connolly v. Medalie,* 58 F.2d 629, 630 (2d Cir. 1932) (L. Hand, J.), the Supreme Court was not. In *Jones v. United States,* 362 U.S. 257, 80

2. We are not, of course, bound by a concession of counsel; in fact, we think that the question of consent was a close one. However, the United States Attorney indicated that he did not feel this search met the standard set out in *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In view of our disposition of this case, we do not reach this issue.

3. This point was properly raised by the government at trial.

S.Ct. 725, 4 L.Ed.2d 697 (1960), the Court held that one charged with a "possessory" crime would be given "automatic" standing to contest the search and seizure. Thus, in a limited class of cases, the defendant's dilemma was eliminated, since no showing of a possessory interest was necessary to challenge a search.

A different tack was taken in *Simmons v. United States*, 390 U.S. 377, 391–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). There, the Supreme Court held that evidence given by a defendant to establish standing at a suppression hearing would be inadmissible at trial. Thus, *Simmons*, unlike *Jones*, left undisturbed the rule that Fourth Amendment rights may not be asserted vicariously.

In *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), the Court considered the interplay of *Jones* and *Simmons*. In strong language, the Court intimated that *Jones* served no purpose in light of *Simmons* ; however, inasmuch as *Brown*, like *Simmons*, involved a non-possessory crime, the Court reserved the question of overruling *Jones*.

■ The United States Attorney urges us to accept the invitation of *Brown* and overrule *Jones*. While the Sixth Circuit has done precisely that, *United States v. Delguyd*, 542 F.2d 346 (6th Cir. 1976), we decline to do so. We need not reach the issue to decide this case. Moreover, in view of the explicit reservation of this question in *Brown*, we feel that overruling *Jones* is properly a matter for the Supreme Court.[4] In light of this, we hold that appellants have automatic standing to challenge the admission of the seized goods with respect to the possession count of the indictment. However, on the conspiracy count, we hold

that they lack automatic standing to challenge the seizure.

■ This case falls squarely within the holding of *Brown*. The petitioners in that case were charged with transportation of stolen goods in interstate commerce and conspiracy to commit that crime. The stolen goods were recovered from a warehouse owned by a co-conspirator. There was no question that the search of the warehouse did not comport with the Fourth Amendment. In holding that the appellants lacked standing to raise the Fourth Amendment claim, Chief Justice Burger wrote:

> In deciding this case, therefore, it is sufficient to hold that there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. The vice of allowing the Government to allege possession as part of the crime charged, and yet deny that there was possession sufficient for standing purposes, is not present. The Government cannot be accused of taking "advantage of contradictory positions."

*Id.* at 229, 93 S.Ct. at 1569. All three legs of this test are met here. Neither Galante nor Cameriero was present at the time of the search.[5] They did not, and could not, allege an interest in the Bristol Bargain Fair. Finally, possession is not an essential element of a conspiracy to possess.

■ Appellants make much of the fact that the jury might have inferred knowledge from the government's proof of pos-

---

**4.** The alternative rationale for the automatic standing rule is the risk that the *prosecutor* may take inconsistent positions, denying possession at the suppression hearing and proving it at trial. We note that in this case, no such contradiction occurred. At all times, the United States Attorney insisted that Galante and Cameriero possessed the stolen lenses, but had no expectation of privacy in the Bristol Bargain

Fair. *See* Gutterman, "A Person Aggrieved": Standing to Suppress Illegally Seized Evidence in Transition, 23 Emory L.J. 111, 125–26 (1974).

**5.** Cameriero was present at the seizure from the truck. However, his presence there gives him standing to contest only the seizure, and not the initial search.

session. Moreover, they correctly point out that one of the overt acts charged in the indictment involved possession.[6] However, even added together, these factors do not transform possession into an essential element of the offense of conspiracy to possess charged here.

*Brown* limits the *Jones* rule to cases in which "possession at the time of the contested search and seizure is 'an essential element of the [crime] charged.'" The Court goes on to define such a situation as one in which the prosecution's case "depend[s] on . . . possession of the seized evidence at the time of the contested search and seizure." 411 U.S. at 228, 93 S.Ct. at 1569. This is simply not such a case.

■ The government is under no obligation to prove possession in a prosecution for conspiracy to possess. *United States v. Sacco,* 436 F.2d 780, 784 (2d Cir.), *cert. denied,* 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971); *United States v. Hodge,* 539 F.2d 898, 902 (6th Cir. 1976). The fact that the

prosecutor chose to introduce evidence on this point does not convert possession into an element of the offense.[7]

■ Nor does the fact that the second overt act charged in this indictment involves possession convert this conspiracy into a possessory offense. In *Brown,* the indictment charged three overt acts involving possession,[8] and yet the conspiracy was held outside the ambit of the automatic standing rule. We reached an identical result in *United States v. Sacco, supra.* There, in a conspiracy to transport stolen goods in interstate commerce, the grand jury alleged possession of the goods as an overt act. 436 F.2d at 783. This Court nonetheless declined to apply the *Jones* rule. *Id.* at 784. We adhere to the rule of *Brown* and *Sacco* and decline to find automatic standing in this case.[9]

## II. *Actual Standing on the Conspiracy Count.*

■ The fact that a defendant lacks automatic standing under *Jones* does not, of

---

**6.** This portion of the indictment reads as follows:

2. On or about the 31st day of March, 1975 the defendant THEODORE N. CAMERIERO and the defendant JOHN FRANK GALANTE, also known as "Chubby", placed a quantity of NIKKOR camera lenses in a hidden area behind a secret panel in premises located at 1662 Pitkin Avenue, Brooklyn, New York.

**7.** An argument to the contrary proves too much, for it would confer standing to raise a Fourth Amendment claim upon every criminal defendant against whom the prosecutor seeks to introduce a given piece of evidence. Although this approach has been urged by a leading scholar in the field, *see* Amsterdam, Perspectives on the Fourth Amendment, 52 Minn. L.Rev. 367–69 (1974), it does not reflect current law. *Simmons, supra,* 390 U.S. at 390 n. 12, 88 S.Ct. 967; *United States v. Tortorello,* 533 F.2d 809 (2d Cir.), *cert. denied,* —— U.S. ——, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976).

**8.** The relevant counts in the *Brown* indictment were as follows:

2. On or about June 12 and June 30, 1970, defendants Joseph E. Brown and Thomas Dean Smith did steal a quantity of merchandise from Central Jobbers Company, Cincinnati, Ohio, and loaded it into a U-Haul truck.

3. On or about June 12 and June 30, defendants Joseph Everette Brown and Thomas

Dean Smith utilized a U-Haul truck to deliver merchandise stolen from Central Jobbers Company, Cincinnati, Ohio, to Knuckles' Dollar General Store, Manchester, Kentucky, a city in the Eastern District of Kentucky, where it was knowingly received by Clinton Knuckles.

4. On or about the 28th day of August, 1970, defendants, Joseph Everette Brown and Thomas Dean Smith did steal a quantity of merchandise from Central Jobbers Company, Cincinnati, Ohio, with the intent and for the purpose of transporting said merchandise to Manchester, Kentucky, where it was to be received at the Dollar General Store by the operator of the store, defendant Clinton Knuckles.

**9.** Even if we were to accept appellants' argument, however, *Jones* would still be inapplicable. The overt act charged involved possession of the stolen goods on March 31. The initial search of Cohen's store took place on April 9, and the seizure of the lenses occurred two days later. As *Brown* makes clear, automatic standing is given only to one who is charged with possession at the time of search. 411 U.S. at 228, 93 S.Ct. 1565. Thus, the lapse of time between the concealment and the search would prove fatal to appellants.

course, deprive him of an opportunity to raise a Fourth Amendment claim. He may, in reliance on *Simmons,* testify at a suppression hearing in order to establish the requisite interest. In such a proceeding, the burden of establishing standing is upon the defendant seeking suppression. *United States v. Masterson,* 383 F.2d 610, 613–14 (2d Cir. 1967), *cert. denied,* 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968). We hold that appellants did not establish standing here.[10]

■ The passage from *Brown* quoted above suggests the two ways in which a defendant who lacks automatic standing may raise a Fourth Amendment claim.[11] Either presence at the time of search or an interest in the premises will establish standing. Neither factor is present here.

■ Neither Galante nor Cameriero had any interest, prior to the crime, in the Bristol Bargain Fair. The mere fact that they chose to warehouse their merchandise there will not confer standing on them. One who conceals contraband or stolen goods on the premises of another does not thereby acquire an interest in those premises. *United States v Tortorello,* 533 F.2d 809, 812–14 (2d Cir. 1976); *United States v. Sacco, supra,* 436 F.2d at 784. As *Brown* emphasizes, a co-conspirator or co-defendant obtains no special rights in this respect. *See also Alderman v. United States,* 394 U.S. 165, 172, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). As we stated in *United States v. Sacco, supra,* 436 F.2d at 784:

Nor does Sacco have standing by virtue of his interest in the stolen television sets. His claim amounts to the contention that he had a sufficient possessory interest in the stolen goods to entitle him to object to their seizure. However, as this court said in *United States v. Lopez,* 420 F.2d 313, 316 (2d Cir. 1969), "it does not follow that a 'possessory interest' in goods seized from another's premises is sufficient in itself to entitle a defendant to suppression." In *United States v. Bozza,* 365 F.2d 206, 223 (2d Cir. 1966), we made it plain that the values sought to be protected by the Fourteenth [sic] Amendment are not "served by holding that a thief who has left evidence of his crime on the premises of a confederate is subro-

10. The trial record is somewhat unclear at this point. All parties seem to have assumed, after a brief objection by the government, that there was standing to object, and proceeded to the merits of the argument. In light of this, we have independently scrutinized the record for evidence which might establish standing, despite the failure of the appellants to introduce evidence on this point at the suppression hearing.

11. Two other bases for establishing standing have been suggested. The first is that mere "possession" of the seized goods, without more, is enough. Even if it were sufficient, it would give standing to contest only the seizure, and not the search. *United States v. Lisk,* 522 F.2d 228, 230–31 (7th Cir.) (Stevens, J.), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1975). The Fourth Amendment protects "people, not places"; it is the invasion of privacy, and not of some property interest, that triggers the operation of the exclusionary rule. *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The appellants could have had no legitimate expectation of privacy in Cohen's store; the only defendant whose rights were infringed by the search was Cohen. Thus, appellants could not have given a valid consent to the search of the Bristol Bargain Fair; they had no right of privacy to waive. However, although he did not do so, Cohen could have voluntarily allowed the search, which would be good against Galante and Cameriero as well. For standing purposes, therefore, appellants are in a position analogous to that in which they would have been had Cohen consented. *United States v. Lisk, supra,* 522 F.2d at 230 n.5; *cf. Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

The second possible basis for standing is that a particular defendant was the intended object of a search. *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). *See Alderman v. United States, supra,* 394 U.S. at 208, 89 S.Ct. 961 (Fortas, J., dissenting). White and Greenspan, Standing to Object To Search and Seizure, 118 U.Pa.L.Rev. 333, 349–56 (1970). Whatever the remaining vitality of this approach after *Alderman* and *Brown,* it has no application in this case. The record clearly discloses that at the time of the search, Cohen was its sole object.

gated to the latter's right to complain of a search and seizure." [12]

■ It is clear that neither appellant was present at the time of the initial search. Thus, under *Brown,* as far as the conspiracy count is concerned, both Cameriero and Galante lack standing to challenge the validity of the warrant.[13]

III. *The Validity of the Seizure With Respect to the Possession Count.*

■ Although appellants have standing to challenge the introduction of the stolen lenses on the possession count, that does not itself require suppression of the evidence. Obviously, one can have standing to contest a search and seizure, and still fail to establish a violation of the constitutional standard. We hold that this is such a case.

The FBI did not seize the lenses at the time they searched the Bristol Bargain Fair., Rather, they left them there and obtained Cohen's cooperation in the investigation. Cohen then called his co-conspirators, and demanded that they remove the goods, The store was kept under surveillance; when Cameriero arrived with a truck to take away the stolen goods, he was arrested as he loaded it.

If the FBI had not made the initial search, but had simply placed the Bristol Bargain Fair under surveillance on the information set out in the search warrant, the seizure of the lenses from the truck would have been valid. Thus, we must answer two related questions. First, we must determine if the illegal search was the "but-for" cause of the seizure. Second, even if we find that to be the case, we must determine if the illegal search so tainted the subsequent seizure as to render it "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See* Fruit of the Poisonous Tree—A Plea for Relevant Criteria, 115 U.Pa.L.Rev. 1136 (1967).

■ As we noted above, it is not at all clear that the initial, illegal search was the but-for cause of the subsequent seizure. Had the police never sought a warrant, or had their application for one properly been denied, they would in all likelihood have placed the Bristol Bargain Fair under surveillance. As we indicated above, a seizure growing out of such activity would have been entirely valid. The mere fact that an invalid warrant was obtained will not, standing alone, invalidate a subsequent seizure. A contrary holding would penalize the police for seeking a warrant, precisely what the Fourth Amendment commands. In this case, the warrant application was made in good faith; it was the understandable mistake of the magistrate in granting it that raises the possibility that the excellent police work involved here will go for naught. We are unwilling to hold that the

12. Appellants urge that they were tenants of the Bristol Bargain Fair, and thus had actual standing. Their argument appears to be that Cohen's acceptance of payment for his part in the conspiracy converted him into a warehouseman or landlord. Were we to accept appellants' argument, we would in effect fashion an automatic standing rule for all defendants in cases involving stolen goods, a result which flies in the face of *Brown,* as well as our own recent holding in *United States v. Tortorello, supra.*

Furthermore, the thread that links all recent search and seizure cases is that the Fourth Amendment protects "people, not places"; the focus has shifted from property to privacy. Appellants are attempting to have it both ways. Inasmuch as a property interest is no longer required for standing purposes, we are unable to see why a "tenancy" which exists, if at all, only in the most technical sense should suffice.

*See Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). What is relevant here for Fourth Amendment purposes is that Cameriero and Galante obtained no right of privacy in the basement; Cohen could have admitted the police at any time. *Cf. Mancusi v. DeForte, supra.*

13. A difficult problem in the administration of criminal justice would arise if on a multi-count indictment, the Court were to deny standing on some counts and grant suppression on others. The prejudice to a defendant in such a situation could be substantial. On the other hand, it appears anomalous for the government to be in a weaker position on the counts where standing is lacking because the grand jury alleged other criminal conduct. Since this case does not raise this troubling issue, we intimate no views on the solution we would adopt in such a case.

police are placed in a weaker position when they attempt to comply with the demands of the Fourth Amendment than when they fail to do so.

Even if we assume, however, that the search of the basement was the but-for cause of the subsequent seizure of the lenses, our inquiry is not at an end. We recently faced a similar situation in *United States v. Mullens*, 536 F.2d 997 (2d Cir. 1976). There, a search conducted under an invalid warrant revealed $11,000 in counterfeit money in the possession of the defendant's mother. Mullens was told by the police that the money had been found and that his mother was heavily implicated. In the face of this, he led the Secret Service to his printing press and counterfeiting plates. He then gave a full confession.

At trial, the defendant moved to suppress all the evidence, contending that nothing would have come to light had it not been for the initial, illegal search. We held that his voluntary cooperation with the Secret Service broke the chain of causation leading to the seized contraband. For the Court, Judge Lumbard wrote:

> Appellant contends that were it not for the unlawful search of his home, his parents would never have been brought to police headquarters and he would not have cooperated with the authorities. Rather than being voluntary, he insists that his filial affection left him with no choice but to act as he did once he learned that his parents were being detained. However, even if true, this reason for his actions falls short of the showing necessary to render either his confession or his consent to search involuntary. Were we to adopt the "but for" reasoning proposed by appellant, "virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind," . . .
>
> Mullens' argument is founded upon a misconceived identity between those choices which are physically or psychologically coerced and those which are merely difficult. Only the former are void under our law. The line, of course, is often a subtle one and must depend in each instance upon an evaluation of the totality of the circumstances presented.

536 F.2d at 999–1000.

This case presents a similar situation. The initial search was directed at Cohen. When the searchers were about to leave without having found the stolen items, Cohen, realizing that he was heavily implicated, led the police to their hiding place. Thereafter, he began to cooperate with the police, by allowing the store to be staked out and luring his confederates to the scene. We hold that, under the totality of the circumstances, the seizure of the lenses from Cameriero was the product of Cohen's voluntary cooperation with the FBI,[14] and, as such, was valid under the Fourth Amendment. Cohen's actions broke the chain of causation. The stolen goods in the Bristol Bargain Fair were not forever immune from seizure by reason of the initial unlawful search.[15] They merely could not be introduced as the product of that police conduct. Here, there were indepen-

---

**14.** An analogous situation would have been presented if, rather than through an illegal search, the police had learned of the lenses while interrogating Cohen in violation of his *Miranda* rights. Even though the illegal conduct would be the "cause" of a subsequent seizure, we do not think that the connection would be sufficiently close to allow Galante and Cameriero to complain of the *Miranda* violation. If involuntary cooperation will not save appellants, we can see no reason why Cohen's voluntary actions should.

**15.** We do not consider it significant that the evidence introduced here, unlike that in *Mul-*

*lens*, is the same as was uncovered in the initial search. The lenses were not forever immunized from search and seizure. Thus, assume that Cameriero and Galante were arrested while selling them. Their seizure at the time of arrest, even after the illegal search of the basement, would have been entirely proper.

Similarly, even though a defendant is illegally arrested, he may validly be re-arrested and convicted. *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). If this is the rule as to personal liberty and security, it must apply equally to seizures of property.

dent, intervening causes; hence, the lenses were properly admitted into evidence.[16]

Thus, we conclude that, as to the conspiracy count, appellants lack standing to contest the search of the Bristol Bargain Fair. As to the possession count, we hold that the seizure of the lenses was not so tainted by the illegal search as to require suppression. We have carefully considered Galante's other contention and find it to be without merit. The judgment of conviction is affirmed.

IRVING R. KAUFMAN, Chief Judge (concurring):

I completely agree with Judge Meskill's able analysis of the difficult questions of standing presented by this case. My difference relates entirely to the majority's view that the seizure of the stolen camera lenses was lawful, although the search was not.

I have always thought that evidence discovered as a result of an unconstitutional search was inadmissible, regardless of the time when it was seized. Moreover, I am not convinced that the agents did not in fact seize the contraband when they discovered it on April 9. Although the record is not too clear on the point, the agents seem to have inspected the cartons to assure themselves that the basement cache really contained the stolen camera lenses. *Cf. United States v. Sokolow*, 450 F.2d 324 (5th Cir. 1971). And, more importantly, the agents plainly exercised dominion over the camera lenses from the moment they were discovered. Under these circumstances, it is clear that the lenses were as much in the Government's possession as if the agents had carted them away.

Although it may be reasonable in this case to distinguish between the search and the seizure, I do not agree that Cohen's "voluntary" cooperation dissipated the taint of the unlawful search. Unlike in *United States v. Mullens*, 536 F.2d 997 (2d Cir. 1976), Cohen did not freely come forward to exonerate a third party. *See United States v. Ceccolini*, 542 F.2d 136, 142, n.9 (2d Cir. 1976). Rather, Cohen's cooperation was induced by his desire to mitigate the consequences of a prosecution against him for a serious offense, based at least in part upon the discovered lenses.

Moreover, I am reluctant to extend *Mullens* to a case like this, because one found in possession of incriminating evidence always has a powerful incentive to cooperate "voluntarily" in a further investigation. The difficulty I have with the majority's analysis is the extent to which it could be carried. If, for example, police unconstitutionally searched a narcotics suspect and discovered contraband, they could partly evade the exclusionary rule by inducing the suspect's cooperation and also delaying formal "seizure" until the drug was passed to a colleague. I fear that such an attenuation would unjustifiably diminish the rule's deterrent effect.

I do believe, however, that on the unusual facts in this case, the law enforcement officials would have discovered the camera lenses even if they had not conducted the April 9 search. The majority correctly observes that the FBI would have placed the Bristol Bargain Fair under surveillance in any event. Cohen, after his initial arrest, was anxiously pressing Galante to remove the cameras. It is inconceivable on these facts that the stolen camera lenses would not have been discovered when Cameriero arrived to cart away the contraband. Accordingly, despite my reservations regarding the majority's application of *Mullens*, I concur.

---

16. Each question of "taint" is one of fact, to be decided individually. We do not mean to suggest, by our ruling today, a *per se* rule in this difficult area.